**SECOND DIVISION**
**MILLER, P. J.,**
**DOYLE, P. J., and REESE, J.**

**NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**March 8, 2018**

# In the Court of Appeals of Georgia

A17A2056. WIMBUSH v. THE STATE.

REESE, Judge.

A Gwinnett County jury found Therian Wimbush[1] guilty beyond a reasonable doubt of committing three counts of cruelty to children in the second degree[2] against R. W. and I. W., two of her ten children. She appeals, proceeding pro se, from the judgment of conviction, and raises a number of alleged errors. For the reasons set forth, infra, we affirm.

---

[1] The Appellant was tried jointly with Recardo Wimbush. Mr. Wimbush is not a party to this appeal.

[2] See OCGA § 16-5-70 (c).

Viewed in the light most favorable to the jury's verdict,[3] the record reveals the following material facts.

*R. W.*

R. W. is the eldest of ten children of Recardo Wimbush and the Appellant, and was sixteen years old at the time of the Appellant's trial in January 2017. R. W. initially, until sometime in 2012 when he was twelve years old, slept with his nine siblings in nine beds in the same room. When he was 12 years old, he began sleeping on a mat in the exercise room in the basement because "[he] had done something wrong, but [he did not] remember what it was." Once R. W. started sleeping in the basement, he was not permitted to play with his siblings or go upstairs and interact with them. He testified that, sometime later, his parents wanted to use the exercise room and "they [ ] cleaned out the closet that was next to it so [he] could sleep in there." Soon after moving into the closet, R. W.'s sleeping mat was replaced by his bed. To relieve boredom while everyone was asleep and without his parents' permission, R. W. went upstairs one night and took a DVD player, hiding it in the box

---

[3] *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979).

spring of his bed. R. W. also took food from upstairs. When his parents found the DVD player, R. W. received a spanking.

Subsequently, on another occasion, R. W. went upstairs without his parents' permission, but was caught by his father and sent back to the basement. The next night, R. W. took a sleeping bag and ran away from home, because he thought he would receive a spanking for having gone back upstairs. R. W. testified that, once he left his home, "[he did not] have any plans" and walked for about 30 to 45 minutes.

On August 22, 2012, an officer with the Gwinnett County Police Department responded to a call about a person walking down a road in Gwinnett County. Upon arrival, the officer encountered a youth, later identified as 12-year-old R. W., carrying a blue sleeping bag and walking down the road. When the officer asked for his name, R. W. responded, "I don't know." The officer testified that R. W. explained that he came from an orphanage, and was "living off of water and food from passerbyers." The police officer asked R. W. his name again and R. W. responded with three separate names and two dates of birth. The officer then placed R. W. into custody for providing false information. After being placed into the patrol vehicle, R. W. properly identified himself to the police officer and provided his date of birth and his mother's phone number. The Appellant arrived at the scene and completed a juvenile complaint

form, which acknowledged that she was assuming custody of R. W. and was aware of a court date in Juvenile Court. The police officer testified that he did not inquire about R. W.'s home life, and neither the Appellant nor R. W. discussed it.

A couple of months later, and without R. W.'s prior knowledge, a lock was placed on the outside of the closet door so that he could not leave the closet. No one spoke to R. W. about why the lock was there or how long it would remain. Although there was a window in the closet, R. W. did not have permission from his parents to open it. There were no lights or bathroom in the closet, and one of R. W.'s parents brought him food once or twice a day. R. W. did not see or play with his siblings, and there were no books, toys, or games in the closet. When his bed sheets became moldy, they were removed without being replaced. R. W. did not exercise in the closet, and spent his time lying on his bed, listening to his "siblings running around and screaming and playing and having fun." When R. W. scratched some of the paint off of the walls to relieve boredom, the Appellant became "upset."

R. W. remained in the closet for "about two years," and during that time, he wore "[a] tank top and underwear." He wore the same clothes the entire time and did not bathe until he went to Juvenile Court. Once R. W. was released from the closet,

he stated that his legs felt weak and he experienced pain when he tried to walk, play, or climb up stairs.

On June 15, 2014, a Department of Family and Children Services ("DFCS") representative visited the Appellant's home in Gwinnett County in response to a report received on the "child abuse hotline that a child was locked in a basement[.]" The next day, a DFCS case manager went to the Appellant's home. Upon arrival, the Appellant answered the door and told the case manager that she had been "expecting someone from the Department to follow up." The Appellant invited the case manager into the home, and the case manager spoke with Recardo Wimbush and the Appellant for about two hours. The case manager testified that, according to the couple's religious beliefs, "when someone commits a sin, they should be separated and they should have to pay restitution." The case manager stated that the Appellant told her that "[R. W.] was sent down to the basement to separate [him] from the family as a punishment for his behavior [ ]" and that R. W. had been in the basement "maybe [about] two years or 18 months." During that visit, the case manager did not visit with any of the children living there, but learned from the Appellant that R. W.

> was sleeping in the basement, just sleeping in the basement, that was just his room. And then I think it was August of 2012 he ran away, and

5

the police brought him back. And then he was more restricted to the basement. And [the Appellant] wasn't exactly sure, but the child said January of 2013 he took a DVD player and a book down to his room. When his mom found it, she put the lock on the room that he was in in the basement.

According to the case manager, after the Appellant placed the lock on the door, R. W. was not permitted to "interact with his siblings[,] he was not allowed to leave the basement[, h]e was just locked in that room."

During a visit to the home on June 18, 2014, the case manager spoke to R. W. in his basement closet. She testified that the closet floor contained dirt and hair and the only furniture in the small room was a box spring and a "very dirty" twin mattress. Further, the mattress had a blanket but no sheets or pillows; the closet's window was covered with white paint; and there was no bulb in the light fixture. Also, the case manager saw a plastic bottle in a corner of the room that she thought contained urine. There were no lamps, books, exercise equipment, medicine, DVD players, or any "form of entertainment" in the room. The word "pride" was written on one of the room's walls with "other smaller words written around each letter."

While the case manager spoke to R. W., he was very soft spoken with a "very flat affect." R. W. admitted to her that he took a DVD player and a book downstairs,

and when his parents located the items, "they placed a lock on the door and he was not allowed to leave the basement area." R. W. also told the case manager that prior to the installation of the lock on his door, he lived in the basement area, but was able to travel upstairs at night after the family was asleep.

The case manager saw R. W. with his parents the next day at a court appearance. He looked "groomed," with his hair cut short, and according to R. W., he had bathed that day. After the court appearance, the case manager accompanied R. W. to the Gwinnett County Police Department for an interview and observed that R. W. paused at the front of the building, held onto the rail, and made an effort to "negotiate how to climb those five steps up into the building." R. W. complained to the case manager of pain in his legs, and she noticed that "he walked with a limp."

The guardian ad litem appointed for all of the Wimbush children interviewed R. W. during the June 19, 2014 court appearance. R. W. told her that "he hadn't seen his siblings in a very long time," since the placement of the lock on the closet door, and "besides leaving to come to Juvenile Court[,] he hadn't been let out of the room[.]" During the interview, R. W. stated that one of his parents allowed him to leave the room to use the restroom maybe two or three times a day. If he needed to use the restroom outside of those times, R. W. relieved himself in a plastic jar in his

room. R. W. could not see out of the closet's window and spent his time in the basement closet picking at "paint on the walls" and listening to what his family was doing in the home. She further testified that R. W. told her his parents had accused him of "inappropriately touch[ing] three of his siblings," but that "[h]e did not appear to have any recollection of ever having done anything like that[.]" R. W. told the guardian ad litem that he stayed in the basement as punishment because "he did bad things, that he had taken the book and the DVD player and he lied." R. W. also told the guardian ad litem that he did not go to school and that his mother used to teach him, but she "stopped teaching him once the lock was placed on the bedroom door." In addition, he told her that he did not recall ever having seen a doctor.

A pediatrician testified that she saw R. W. on July 18, 2014, for a medical examination and that the youth reported that "he had pain in his legs, knees, and ankles; that he felt tired pretty frequently [and] occasionally after walking for a while, he had a little bit of a limp." R. W. had a fungal rash on his abdomen and his back, and x-rays of R. W.'s legs, knees, and wrists showed osteopenia and growth crease lines. According to the pediatrician, osteopenia is defined as "increased bone destruction, decreased bone formation" that takes awhile to develop and is rare in juveniles, and that contributing factors are immobilization for a long period of time

8

and the inability to do "weight[-]bearing exercises[.]" R. W.'s general screening laboratory results showed that his Vitamin D level was "significantly low," and the pediatrician testified that Vitamin D deficiency "can lead to easy fatigue."

An expert in child psychiatry conducted a psychiatric forensic examination of R. W. in July 2015. R. W. told him that he lived in the basement for "about [a] year and a half" and in that room, "[t]here was practically nothing to do[,] . . . he really didn't have any books or other things to entertain himself with." The child psychiatrist testified that R. W. was "pretty lonely" and felt "left out [, h]e could hear other members of the family a lot of the time and [R. W.] wanted to be part of it." R. W. expressed to the child psychiatrist a "longing to be with his family, which [R. W.] found quite painful." The psychiatrist testified that R. W. appeared to be "unclear" about why he was originally punished. R. W. underwent a psychosexual evaluation, and the results were "normal." The child psychiatrist testified that R. W. did not receive physical exercise while he was locked in the basement and was "really quite weak[ ]" upon his release, but he did not complain because he "just thought that would make things worse."

*I. W.*

The guardian ad litem met I. W. on June 26, 2014, when he was eight years old. During the interview, I. W. "could not recall having gone to a doctor." The guardian ad litem testified that she saw a mass roughly the "size of [her] fist" just above the child's waistline on the left side of his abdomen. I. W. "was very clear that both his parents and his siblings were aware that the mass was there." I. W. told the guardian ad litem that the mass "had been there for as long as he could remember, that it had gotten larger," and that it "itched."

A pediatric oncologist testified that he met I. W. in November 2014 after the child was referred to him for the abdominal mass. The oncologist diagnosed I. W.'s mass as a "giant cell fibroblastoma," which is a rare tumor that grows "very slowly." He testified that I. W.'s tumor was the "most extensive giant cell fibroblastoma that [he had] ever seen present at this stage[ ]" and that removal of the tumor was "a very involved surgery or very involved process." The oncologist testified that I. W. told him that the tumor had been there "as long as he could remember." He testified that since November 2014, I. W. had received chemotherapy that had possible side effects of "prevent[ing] height" and causing skin rashes and nausea, and that I. W. underwent surgery to "remove visible masses from the abdominal wall[.]" According to the

10

oncologist, however, "the surgery was ineffective in controlling [I. W.'s] tumor[.]" At the time of the Appellant's trial, in January 2017, I. W. was again receiving chemotherapy.

I. W.'s paternal uncle testified that I. W. was living with him at the time of trial and that the child's medication "causes him to be nauseous. . . . [S]ometimes [it was] an all-[d]ay occurrence for [I. W.] that . . . drain[ed] him. He [was] not able to do things that he would normally want to do." The uncle testified that, prior to surgery, I. W. had been anxious, nervous, and apprehensive.

At the conclusion of the State's case-in-chief, the trial court denied the Appellant's motion for a directed verdict. The jury found the Appellant not guilty of four counts of cruelty to children in the first degree, and found her guilty of three counts of cruelty to children in the second degree. The trial court sentenced her to serve twenty years in confinement followed by ten years on probation. The Appellant appeals from her convictions.

> Generally, on appeal from a criminal conviction, the appellate court view[s] the evidence in the light most favorable to the verdict and an appellant no longer enjoys the presumption of innocence. [The] Court determines whether the evidence is sufficient under the standard of

11

*Jackson v. Virginia*,[4] and does not weigh the evidence or determine witness credibility. Any conflicts or inconsistencies in the evidence are for the jury to resolve. As long as there is some competent evidence, even though contradicted, to support each fact necessary to make out the State's case, [the Court] must uphold the jury's verdict.[5]

The standard of *Jackson v. Virginia* is met if the evidence is sufficient for any rational trier of fact to find the defendant guilty beyond a reasonable doubt of the crimes charged.[6] With these guiding principles in mind, we turn now to the Appellant's specific claims of error.

Before reaching the merits of the Appellant's contentions, however, we note that her brief does not contain proper citations to the record or transcripts, which are essential for our consideration of her enumerated errors.[7] Further, the Appellant failed to state the method by which each enumerated error was preserved for appellate review.[8] Pro se status does not relieve a party from the "obligation to comply with the

---

[4] 443 U. S. at 319 (III) (B).

[5] *Rankin v. State*, 278 Ga. 704, 705 (606 SE2d 269) (2004) (citations omitted).

[6] *Clark v. State*, 275 Ga. 220, 221 (1) (564 SE2d 191) (2002).

[7] See Court of Appeals Rule 25 (a) (1), (c) (2) (i).

[8] See Court of Appeals Rule 25 (a) (1).

substantive and procedural requirements of the law, including the rules of this Court."[9]

> The rules of this court are not intended to provide an obstacle for the unwary or the pro se appellant. Briefs that do not conform to the rules regarding enumerations of error, structure of briefs, argument, or citation of authorities, as [the Appellant's] fails to do, are not merely an inconvenience or grounds for refusing to consider a party's contentions. Such briefs hinder this court in determining the substance and basis of an appellant's contentions both in fact and in law and may well prejudice an appellant's appeal regardless of the amount of leniency shown. [10]

Nevertheless, we will address the arguments of the Appellant to the extent we are able to discern them from her brief.

1. The Appellant contends that the trial court erred in denying her motion for directed verdict and that the evidence was insufficient to support her convictions on cruelty to children in the second degree. Specifically, she argues that the "record is

---

[9] *West v. West*, 299 Ga. App. 643, 644 (683 SE2d 153) (2009) (citation omitted).

[10] *Williams v. State*, 318 Ga. App. 744, 744-745 (734 SE2d 745) (2012) (citation omitted).

void of any evidence that either child suffered any mental or physical pain or injury, nor that any such pain or injury" was caused by her. We disagree.

Counts 3 and 4 charged the Appellant with committing child cruelty by "confining [R. W.] in a room for months without sufficient mental stimulation and social interaction" and "failing to provide physical exercise" for R. W. Count 7 charged the Appellant with committing child cruelty by "failing to seek medical care for [I. W.'s] abdominal skin cancer."

Cruelty to children in the second degree, prohibited by OCGA § 16-5-70 (c), is committed when a person "with criminal negligence causes a child under the age of 18 cruel or excessive physical or mental pain." Criminal negligence is defined as "an act or failure to act which demonstrates a willful, wanton, or reckless disregard for the safety of others who might reasonably be expected to be injured thereby."[11]

As to Count 3, the evidence showed that R. W. felt lonely and isolated from his siblings while he was locked away in a small closet in the basement for approximately two years, with only one or two daily visits from a parent. The closet had no lamp and only contained an uncovered mattress, a box spring, and a plastic jar used to store R. W.'s urine. The window in the room was covered, and R. W. was forbidden to

---

[11] OCGA § 16-2-1 (b).

14

open it, so the room had no natural light or fresh air. R. W. received little, if any, formal education, and he was unable to exercise or play while confined in the closet. He was not permitted to bathe and wore the same clothes for the two years during his confinement. There was testimony at trial that R. W.'s fingernails were long and jagged from peeling paint off of the closet walls.

Regarding Count 4, several witnesses testified that R. W. complained of pain in his legs and of fatigue. R. W.'s treating pediatrician testified that R. W. suffered from osteopenia in his wrists, knees, and legs, a rare condition that was likely caused by his confinement to a small room, which prohibited him from playing, running, and exercising. She also testified that R. W. had "significantly low" levels of Vitamin D in his body, which can cause weakness and fatigue.

Finally, as for Count 7, the evidence showed that I. W. had a cancerous tumor for a very long time and that his parents were aware of it, yet they failed to provide him with any medical treatment. When the tumor was finally diagnosed, it was so large that I. W. required surgery and at least two rounds of chemotherapy to treat it. I. W.'s paternal uncle testified that the chemotherapy made I. W. nauseous, which "drain[ed]" him and kept him from doing things he normally wanted to do.

As noted above, it was up to the jury, not this Court, to determine whether there was sufficient evidence to find the Appellant guilty beyond a reasonable doubt of the crimes charged, and this Court will not interfere with that determination as long as it was supported by evidence at trial.[12] Given the record before us, including the testimony of the children, expert witnesses, and treating physicians, we find that the jury's guilty verdicts on Counts 3, 4, and 7 were supported by sufficient evidence, and it was not error for the trial court to deny the Appellant's motion for a directed verdict.[13]

2. The Appellant argues that the trial court erred in denying her motions for discharge and acquittal pursuant to OCGA § 17-7-170 and her constitutional right to a speedy trial. We find no error.

(a) The Appellant contends that the trial court erred by denying her motions for discharge and acquittal under OCGA § 17-7-170. The record shows that the

---

[12] See *McKee v. State*, 275 Ga. App. 646, 647 (1) (621 SE2d 611) (2005) ("We neither weigh the evidence nor judge the credibility of witnesses, but determine only whether the evidence was sufficient for a rational trier of fact to find the defendant guilty of the charged offense beyond a reasonable doubt.") (citation omitted).

[13] See *Bray v. State*, 294 Ga. App. 562, 563 (1) (669 SE2d 509) (2008) ("A jury is authorized to believe or disbelieve all or any part of the testimony of witnesses, and it serves as the arbiter of conflicts in the evidence before it.") (citation and punctuation omitted).

Appellant originally filed a statutory speedy trial demand on October 27, 2014. On December 2, 2014, the trial court issued an order denying the Appellant's motion for failure to "comply with the service requirements" of OCGA § 17-7-170 (a)."[14] The Appellant argued in a January 2017 hearing that she properly served the motion upon the trial court judge. After the hearing, the trial court again denied her motion.

Despite her assertions to the contrary, the Appellant has not shown that she properly served the trial court judge with the motion for speedy trial. The certificate of service attached to the motion indicated service upon the Clerk of Gwinnett County Superior Court, "with an adequate amount of copies to be distributed by the Clerk's Office, to all included parties." On its face, there is nothing in the certificate of service that shows that the Appellant properly served the trial court judge, as required by OCGA § 17-7-170 (a). Therefore, it was not error for the trial court to deny the motion for speedy trial based on the Appellant's failure to comply with the service requirements set forth in OCGA § 17-7-170 (a).[15]

---

[14] OCGA § 17-7-170 (a) states in pertinent part: "[T]he demand for speedy trial shall be filed with the clerk of court and served upon the prosecutor and upon the judge to whom the case is assigned or, if the case is not assigned, upon the chief judge of the court in which the case is pending."

[15] See *Webb v. State*, 278 Ga. App. 9, 10 (1) (627 SE2d 925) (2006) (The trial court correctly denied the defendant's demand for discharge and acquittal under

(b) The Appellant asserts that the trial court abused its discretion in denying her motion for discharge and acquittal based on a violation of her constitutional right to a speedy trial. We disagree.

An individual accused of criminal activity is guaranteed the right to a speedy trial by the Sixth Amendment to the United States Constitution and Article 1, Section 1, Paragraph XI (a) of the Georgia Constitution.[16] When considering an accused's motion for discharge and acquittal on the basis of a constitutional speedy trial violation, a trial court must perform a two-stage analysis, pursuant to *Barker v. Wingo*[17] and *Doggett v. United States*[18] (the "*Barker-Doggett*" analysis).[19]

In the first stage, a trial court must make

---

OCGA § 17-7-170 because the certificate of service did not show that the motion was served on either the prosecutor or the judge.).

[16] *Sechler v. State*, 316 Ga. App. 675, 676 (730 SE2d 142) (2012).

[17] 407 U. S. 514, 530 (IV) (92 SCt 2182, 33 LE2d 101) (1972).

[18] 505 U. S. 647, 651 (112 SCt 2686, 120 LE2d 520) (1992).

[19] *Johnson v. State*, 313 Ga. App. 895, 897 (723 SE2d 100) (2012); see *Sechler*, 316 Ga. App. at 677 ("The template for deciding constitutional speedy trial claims is well established and involves application of the [*Barker-Doggett*] analysis[.]") (citations omitted).

a threshold determination as to whether the interval between the accused's arrest, indictment, formal accusation, or other triggering event and the trial is sufficiently long for it to be presumptively prejudicial. If that presumption is unwarranted, then the analysis goes no further because the speedy trial claim fails; however, if the delay raises the presumption of prejudice, then the analysis proceeds to the examination of all the *Barker v. Wingo*[20] factors.[21]

The second stage requires a court to

engage in a balancing test with the following factors being considered: (1) the length of the delay; (2) the reasons for the delay; (3) the defendant's assertion of the right to a speedy trial; and (4) prejudice to the defendant.[22] The existence of no one factor is either necessary or sufficient to sustain a speedy trial claim, and a trial court's findings of fact and its weighing of disputed facts will be afforded deference on appeal.[23]

---

[20] *Barker*, 407 U. S. at 530 (IV).

[21] *Jenkins v. State*, 294 Ga. 506, 510 (2) (755 SE2d 138) (2014) (citation and punctuation omitted).

[22] *Barker*, 407 U. S. at 530 (IV).

[23] *Higgenbottom v. State*, 290 Ga. 198, 200 (1) (719 SE2d 482) (2011) (citation and punctuation omitted).

"[O]n appeal, we review the trial court's weighing of each [*Barker-Doggett*] factor and its balancing of all four factors only for abuse of discretion."[24] However, if the trial court clearly erred in some of its findings of fact and/or misapplied the law, the deference owed by this Court to the trial court's ultimate ruling is diminished.[25] "The trial court's order must provide sufficient findings of fact and conclusions of law to permit this Court to determine if the trial court properly exercised its discretion under the *Barker-Doggett* analysis."[26]

The relevant time line is as follows. The Appellant was arrested on June 27, 2014. On September 4, 2014, she was indicted on two charges of cruelty to children in the first degree with regard to R. W. On November 2, 2016, the Appellant was re-indicted, adding charges of cruelty to children in the second degree with regard to R. W.[27] In the same indictment, the Appellant was indicted on charges of cruelty to children in the first and second degree with regard to I. W. She filed a motion for

---

[24] *Johnson*, 313 Ga. App. at 898 (punctuation and footnotes omitted).

[25] Id. (citation omitted).

[26] *York v. State*, 334 Ga. App. 581, 584 (2) (780 SE2d 352) (2015) (citation and punctuation omitted).

[27] After obtaining the second indictment, the State filed a motion to nolle prosequi the first indictment and the trial court granted the State's motion.

discharge and acquittal for failure to comply with her constitutional right to a speedy trial on June 3, 2015, which the trial court denied. The Appellant filed subsequent constitutional speedy trial demands, which the trial court heard on December 28, 2016.

*Threshold Inquiry*

"The pretrial delay is measured from the accused's arrest, indictment, or other formal accusation, whichever comes first, to the trial or, if the accused files a motion to dismiss the indictment, until the trial court denies the motion."[28] "In general, a delay of one year in prosecuting a crime is considered to be delay which is presumptively prejudicial."[29] In its order issued January 5, 2017, the trial court determined that "the delay of approximately two and a half years from the time of arrest until the time of this motion hearing and trial scheduled for January 23, 2017 is presumptively prejudicial." We agree that the time frame was presumptively prejudicial, and so proceed to review the trial court's findings with respect to the second stage of the *Barker-Doggett* analysis.

---

[28] *York*, 334 Ga. App. at 584 (2) (a) (citation and punctuation omitted).

[29] *Jenkins*, 294 Ga. at 510 (2) (a) (citation omitted).

21

## *The Four Factors*

(i) *Length of the Delay*. The trial court's findings relied on the prosecutor's testimony that "this case [had] not taken significantly longer to be reached for trial than similarly situated felony criminal cases in the Gwinnett County Judicial Circuit that require[d] a resolution by trial." The trial court balanced this factor as neutral, i.e., not the fault of either party. We find that the trial court did not abuse its discretion.[30]

(ii) *Reasons for the Delay*. This factor requires a trial court to examine both the reasons for the delay and whether the delay was attributable to the State or to the accused, and then assign the various degrees of weight to the different reasons provided by the State and the accused, respectively.[31] In the present case, the trial court, in its extensive findings of fact, specifically noted the numerous motions filed by the Appellant and that many of them were "deemed to be unsupported by fact and/or law, were time-consuming and hampered the readiness of the case to move

---

[30] See *Weems v. State*, 310 Ga. App. 590, 592 (2) (a) (714 SE2d 119) (2011) (In considering the length of delay in the *Barker-Doggett* analysis, "the mere passage of time is not enough, without more, to constitute a denial of due process.") (punctuation and footnote omitted).

[31] *York*, 334 Ga. App. at 586 (2) (b) (ii).

22

forward to trial." The trial court found that the Appellant's motions were "redundant in their allegations, [and] raise[d] similar issues in multiple filings[.]" The trial court weighed this factor heavily against the Appellant. We find no abuse of discretion.[32]

(iii) *Assertion of the Right to Speedy Trial*.

The relevant question as to the third *Barker-Doggett* factor is "whether the accused has asserted the right to a speedy trial in due course. This requires a close examination of the procedural history of the case with particular attention to the timing, form, and vigor of the accused's demands to be tried immediately."[33] The trial court found that the Appellant " ha[d] purportedly asserted the right to a speedy trial, while at the same time, deliberately filing motions to seemingly delay and avoid trial in this case." Ultimately, the trial court weighed this factor favorably to the Appellant, diminished partially due to her "manner of intentionally manipulating the judicial process by filing numerous, duplicative motions . . . while simultaneously standing

---

[32] See *Rackoff v. State*, 275 Ga. App. 737, 738 (1) (b) (621 SE2d 841) (2005) (Reasons for delay under the *Baker-Doggett* analysis were largely attributable to the defendant's filing of pretrial motions.).

[33] *Ruffin v. State*, 284 Ga. 52, 63 (2) (b) (iii) (663 SE2d 189) (2008) (punctuation and footnotes omitted); see *State v. Pickett*, 288 Ga. 674, 676 (2) (c) (3) (706 SE2d 561) (2011) ("[O]nce [the defendant's] constitutional right accrues, [he] has the responsibility to assert it, and delay in doing so normally will be weighed against him.") (citations omitted).

in the way of her case being reached for a speedy and timely resolution by trial." We find no abuse of discretion.[34]

(iv) *Prejudice to the Appellant.* "In evaluating this final factor, we consider three interests which the speedy trial right is designed to protect: preventing oppressive pretrial incarceration, minimizing anxiety and concern of the defendant, and, most importantly, limiting the possibility that the defense will be impaired."[35] The trial court weighed this factor heavily against the Appellant, finding that she "failed to meet her burden of establishing prejudice to her case as a result of any delays . . . [and] [s]he ha[d] not established proof of a loss of evidence or proof of the unavailability of witnesses due to the delay of bringing this case to trial."

The Appellant argues that her ten children were "illegally and unconstitutionally removed from their home, without any findings of parental unfitness[.]" Yet, as the trial court noted, "pursuant to rulings and [o]rders from the Juvenile Court of Gwinnett County, [the Appellant] no longer ha[d] custody of her

[34] See *Oliver v. State*, 262 Ga. App. 637, 641 (4) (c) (586 SE2d 333) (2003) (The trial court did not err in heavily weighing the assertion of speedy trial factor under the *Barker-Doggett* analysis against the defendant who filed numerous pretrial motions that required the trial court to rule upon before trial could commence.).

[35] *Johnson*, 313 Ga. App. at 904 (2) (d) (punctuation and footnote omitted).

ten children, nor [was] she permitted to have any contact with any of her ten children[.]"

The record also shows that the Appellant failed to present "specific evidence of how the delay impaired [her] ability to defend [herself]."[36] We find that the trial court did not abuse its discretion in weighing this factor against the Appellant.

(v) *Balancing the Four Factors*. The trial court found that the delay before trial was "neutral"; the reasons for the delay "weighed strongly in favor of the State"; the assertion of the right to speedy trial was "weighed favorably to [the Appellant]," but the weight was partially diminished due to her "manner of intentionally manipulating the judicial process"; and the issue of prejudice weighed "favorably to [the Appellant]," yet was limited in part because of her "own actions in the handling of her case prior to trial." Based on these conclusions, the trial court ruled that the State did not violate the Appellant's constitutional right to a speedy trial.

---

[36] *Higgins v. State*, 308 Ga. App. 257, 262 (2) (d) (707 SE2d 523) (2011) ("Anxiety and concern of the accused are always present to some extent, and thus absent some unusual showing are not likely to be determinative in defendant's favor.") (citation, punctuation, and emphasis omitted).

We find that the trial court did not abuse its discretion in applying the *Barker-Doggett* analysis in this case. Consequently, we find that it was not an abuse of discretion for the trial court to deny the motion for discharge and acquittal.

3. The Appellant alleges that the trial court erred in denying her motions, to recuse all "Gwinnett Judicial Circuit Judges" and "Gwinnett Circuit Judges and All Ninth Judicial District Judges." She also claims the trial court erred in not conducting a hearing on her recusal motions filed May 9, 2016, and May 31, 2016. We disagree.

"When a motion to recuse is presented, the judge can rule on the timeliness of the motion and the legal sufficiency of the affidavit, and it is as much the duty of a judge not to grant the motion to recuse when the motion is legally insufficient as it is to recuse when the motion is meritorious."[37] Pursuant to Uniform Superior Court Rule ("USCR") 25.3, upon the filing of a motion to recuse, the trial judge must temporarily cease acting upon the merits of the matter and immediately determine

> (1) the timeliness of the motion and (2) the legal sufficiency of the
> affidavit, and (3) make a determination, assuming any of the facts
> alleged in the affidavit to be true, whether recusal would be warranted.
> If it is found that the motion is timely, the affidavit sufficient and that

---

[37] *Brewer v. Waldroup*, 259 Ga. App. 479, 480 (578 SE2d 139) (2003) (citations and punctuation omitted).

recusal would be authorized if some or all of the facts set forth in the affidavit are true, another judge shall be assigned to hear the motion to recuse.[38]

The record shows that, despite the Appellant's assertions to the contrary, her motion to recuse filed on May 9, 2016, was ruled upon by the trial court on September 29, 2016. In that order, the trial court found the motion untimely pursuant to USCR 25.3 and that her affidavit was "insufficient on its face." Also, the trial court stated it was without authority to hear the Appellant's motion to recuse all ninth judicial circuit judges in its order dated January 4, 2017. The Appellant has not provided any

---

[38] Id.; USCR 25.3. states

When a judge is presented with a motion to recuse, or disqualify, accompanied by an affidavit, the judge shall temporarily cease to act upon the merits of the matter and shall immediately determine the timeliness of the motion and the legal sufficiency of the affidavit, and make a determination, assuming any of the facts alleged in the affidavit to be true, whether recusal would be warranted. If it is found that the motion is timely, the affidavit sufficient and that recusal would be authorized if some or all of the facts set forth in the affidavit are true, another judge shall be assigned to hear the motion to recuse. The allegations of the motion shall stand denied automatically. The trial judge shall not otherwise oppose the motion. In reviewing a motion to recuse, the judge shall be guided by Canon 3(E) of the Georgia Code of Judicial Conduct.

evidence or citations to authority that demonstrate error by the trial court.[39] Thus, we find that the Appellant has not met her threshold burden.[40]

As to the Appellant's argument that all of her motions to recuse were not heard by the trial court, the record shows that she announced ready for trial without requesting rulings on the outstanding motions. Because she did not obtain the rulings before announcing ready for trial, the issue is not preserved for appeal.[41]

4. The Appellant alleges that the trial court erred in failing to merge Counts 3 and 4 for sentencing purposes. We disagree.

"The doctrine of merger precludes the imposition of multiple punishment when the same conduct establishes the commission of more than one crime."[42] While a

---

[39] See Court of Appeals Rule 25 (c) (2) ("Any enumeration of error that is not supported in the brief by citation of authority or argument may be deemed abandoned.").

[40] See *Zellars v. State*, 314 Ga. App. 88, 89 (1) (723 SE2d 319) (2012) (The party alleging error on appeal carries the burden of showing it affirmatively by the record, and if that burden is not met, the trial court's judgment is assumed to be correct and will be affirmed.).

[41] *Shields v. State*, 269 Ga. 177, 179 (3) (496 SE2d 719) (1998).

[42] *McKenzie v. State*, 302 Ga. App. 538, 539 (1) (a) (691 SE2d 352) (2010) (citing OCGA § 16-1-7 (a), and *Drinkard v. Walker*, 281 Ga. 211 (636 SE2d 530) (2006)).

defendant's conduct may constitute more than one crime, Georgia law bars conviction and punishment of more than one crime if one crime is included in the other.[43]

> An accused may be convicted of a crime included in a crime charged in the indictment or accusation. A crime is so included when: (1) It is established by proof of the same or less than all the facts or a less culpable mental state than is required to establish the commission of the crime charged; or (2) It differs from the crime charged only in the respect that a less serious injury or risk of injury to the same person, property, or public interest or a lesser kind of culpability suffices to establish its commission.[44]

"The key question in determining whether a merger has occurred is whether the different offenses are proven with the same facts. For example, if one crime is complete before the other takes place, the two crimes do not merge. However, if the same facts are used to prove the different offenses, the different crimes merge."[45] The question of whether offenses merge is a legal one, to which this Court applies a "plain legal error" standard of review.[46]

---

[43] OCGA § 16-1-7 (a) (1); *Drinkard*, 281 Ga. at 212.

[44] OCGA § 16-1-6.

[45] *Bonner v. State*, 308 Ga. App. 827, 830 (2) (709 SE2d 358) (2011) (footnote omitted).

[46] *Osborne v. State*, 318 Ga. App. 339, 340 (1) (734 SE2d 59) (2012).

In the present case, Count 3 charged the Appellant with causing "excessive mental pain by confining [R. W.] in a room for months without sufficient mental stimulation and social interaction." In contrast, Count 4 charged the Appellant with causing "cruel and excessive physical pain, by failing to provide [R. W. with] physical exercise[.]" Convictions do not merge when they are based on separate acts that are neither factually nor legally contained in the other respective counts, as charged.[47] Here, each of the counts asserts that the Appellant's different acts caused a different type of harm, and each requires different evidence to prove harm. Consequently, the trial court was not required to merge the convictions for sentencing.[48] Consequently, the offenses did not merge as a matter of fact.

5. The Appellant contends that the trial court erred in admitting evidence at trial that violated the child hearsay statute.[49] She failed, however, to specifically

---

[47] *Daniel v. State*, 292 Ga. App. 560, 566 (5) (665 SE2d 696) (2008).

[48] See id.; see also *Gaston v. State*, 317 Ga. App. 645, 651 (3) (731 SE2d 79) (2012).

[49] Georgia's child hearsay statute, codified at OCGA § 24-8-820 states, A statement made by a child younger than 16 years of age describing any act of sexual contact or physical abuse performed with or on such child by another or with or on another in the presence of such child shall be admissible in evidence by the testimony of the person to whom made if the proponent of such statement provides notice to the adverse party

30

identify the testimony she claims was improperly admitted in support of her argument. "It is not the function of this [C]ourt to cull the record in search of error."[50]

As stated in Division 1, supra, there was sufficient evidence of physical pain suffered by R. W. and I. W. presented at trial by both minors, their guardian ad litem, their treating physicians, and other expert testimony sufficient for the jury to find the Appellant guilty beyond a reasonable doubt of Counts 3, 4, and 7 of the indictment. Thus, this argument is without merit.[51]

6. The Appellant contends that the trial court erred in denying her demurrers to the indictments. She argues that the date range in each count was too broad to determine when the alleged crimes were committed. She also contends that the indictments failed to state that her alleged acts injured the children. We disagree.

---

prior to trial of the intention to use such out-of-court statement and such child testifies at the trial, unless the adverse party forfeits or waives such child's testimony as provided in this title, and, at the time of the testimony regarding the out-of-court statements, the person to whom the child made such statement is subject to cross-examination regarding the out-of-court statements.

[50] *Rainly v. State*, 307 Ga. App. 467, 477 (6) (705 SE2d 246) (2010) (footnote omitted).

[51] See Court of Appeals Rule 25 (a) (1), (c) (2) (i).

(a) As stated in Division 2 (b), supra, the Appellant was initially indicted in September 2014, and then re-indicted with a superseding indictment in November 2016. The Appellant's arguments as to the first indictment, which charged her with offenses against R. W., are moot. "A grand jury is not prevented from returning another indictment against an accused, even though an indictment is pending, where there has been no jeopardy upon the first indictment."[52] Because no jeopardy attached to the first indictment and it was dismissed after the State obtained the superseding indictment, this contention is moot.[53]

The Appellant argues that the date range in the superseding indictment lacks sufficiency specificity and improperly includes a period of time when she was incarcerated. We disagree.

"The general rule is that when the exact date of a crime is not a material allegation of the indictment, the crime may be proved to have taken place on any date prior to the return of the indictment, so long as the date is within the applicable statute

---

[52] *Hayward-El v. State*, 284 Ga. App. 125, 127 (2) (643 SE2d 242) (2007) (citation and punctuation omitted).

[53] See id.; see generally *Jayko v. State*, 335 Ga. App. 684, 685 (782 SE2d 788) (2016) ("When the remedy sought in litigation no longer benefits the party seeking it, the [issue] is moot[.]") (citations and punctuation omitted).

of limitation."[54] "In contrast to a general demurrer, a special demurrer merely objects to the *form* of an indictment and seeks more information or greater specificity about the offense charged."[55] "[W]here the State can show that the evidence does not permit it to allege a specific date on which the offense occurred, the State is permitted to allege that the crime occurred between two particular dates. In such a situation, though, the range of dates alleged in the indictment should not be unreasonably broad."[56]

In its first order denying the Appellant's special demurrer to the superseding indictment, the trial court found that "the language of each count of the indictment tracks the statutory language for cruelty to children, first degree and cruelty to children, second degree and its various subparts for each count of the indictment." The trial court also ruled that the Appellant was "sufficiently placed on notice" for

---

[54] *Coats v. State*, 303 Ga. App. 818, 820 (1) (695 SE2d 285) (2010) (The indictment was sufficient because the exact dates of the crimes were not essential elements of the charged offenses.) (citations and punctuation omitted).

[55] *Everhart*, 337 Ga. App. 337 Ga. App. 348, 353 (3) (a) (786 SE2d 866) (2016) (citation, punctuation, and emphasis omitted).

[56] *Ferguson v. State*, 335 Ga. App. 862, 868 (2) (783 SE2d 380) (2016) (citation omitted).

the crimes charged against her and what she "[had to] be prepared to defend [against] at trial."

In a subsequent order denying another demurrer filed by the Appellant, the trial court stated, "the date range listed in each count of the indictment [had] been made a material allegation of any count of the indictment." The Appellant has not offered any reason, such as an alibi defense, that would make the date range material to the State's case, nor has she shown that she was prejudiced by the State's failure to provide specific dates.[57] She has also failed to show that the State was able to allege a specific date or a more narrow range of dates.[58] Therefore, the trial court did not err in denying her special demurrer.[59]

(b) The Appellant argues that the indictment lacks sufficient facts to charge her with a crime. We disagree.

> A general demurrer challenges the validity of an indictment by asserting that the substance of the indictment is legally insufficient to charge any crime. In other words, a general demurrer is essentially a claim that the indictment is fatally defective and, therefore, void,

---

[57] See *Coats*, 303 Ga. App. at 820 (1).

[58] Id.

[59] Id.

34

because it fails to allege facts that constitute the charged crime or any other crime, including a lesser included offense of the charged crime.[60]

The trial court stated in its ruling, "the indictment track[ed] the statutory language of the indicted offenses and sufficiently apprise[d] the [Appellant] of the conduct alleged to be in violation of the law with sufficient specificity to put [the defendant] on notice to prepare [her] respective defenses to the allegations." We conclude that the language of the indictment tracked the applicable statute and contained sufficient facts to inform the Appellant of the elements of the criminal offense of cruelty to children in the first and second degrees. Therefore, this argument is without merit.

7. The Appellant argues that the trial court erred in denying her motion to suppress evidence, contending that the search warrants were invalid and that the photos taken of her residence were improperly admitted. This argument is without merit for the reasons set forth, infra.

(a) The Appellant alleges that the search warrants were invalid because the State lacked probable cause. We disagree.

A magistrate may issue a search warrant only when the circumstances set forth in the affidavit establish probable cause that contraband or

---

[60] *Everhart v. State*, 337 Ga. App. at 353 (3) (a).

evidence of a crime will be found in a particular place. On appeal, we must determine whether the magistrate had a "substantial basis" for concluding that probable cause existed to issue the search warrant. Doubtful cases should be resolved in favor of upholding a magistrate's determination that a warrant is proper.[61]

The record shows two separate warrants were issued and executed at the Appellant's residence. The State proffered testimony of the investigators that signed each of the warrants, and both testified were subject to cross-examination by the Appellant.

The trial court, in its order denying the motion to suppress, found that there was a "substantial basis for [the trial court] to conclude that probable cause existed for the magistrate judge to issue the search warrants[.]" The trial court also concluded that "[a]ll [the] evidence obtained pursuant to the lawfully obtained and lawfully executed search warrants in this case [were] admissible in evidence[.]"

Based on our review of the record, we find that the trial court did not err in concluding that there was probable cause for the issuance of both search warrants and that both search warrants were lawfully executed.[62]

---

[61] *Gerbert v. State*, 339 Ga. App. 164, 166 (1) (793 SE2d 131) (2016) (citations and punctuation omitted).

[62] Id. at 167 (1) (b).

(b) The Appellant alleges that the photographs taken by the DFCS case manager during a home visit were illegally obtained and inadmissible.

At trial, the State introduced the photographs taken by the DFCS case manager during her initial visit with R. W., and the Appellant did not object. Since the Appellant did not object to the introduction of the photographs, this issue has not been preserved for appeal and is therefore waived.[63]

8. The Appellant argues that the trial court record is "replete with due process violations" due to the trial courts "repeated failure and refusal" to follow various state and federal statutes. Most of the due process violations alleged by the Appellant have been addressed in Divisions 1 through 8, supra, in this opinion. We will address the remainder of her allegations.

(a) The Appellant argues that the trial court erred in denying her bond prior to trial. The Appellant filed several motions for bond, each of which were denied by the trial court. She argues that, pursuant to OCGA § 17-6-1 and USCR 26.1 (H), the trial court was required to set bond in her case.

---

[63] See *Hunter v. State*, 202 Ga. App. 195, 196 (3) (413 SE2d 526) (1991) ("[W]hile evidence may be subject to objection[,] yet if no objection is made in the trial court, or if the only objection made is not good, no reversible error is committed by the trial court in allowing the evidence to be submitted.") (citation and punctuation omitted).

OCGA § 17-6-1 (e) (4) states that a trial court shall be authorized to release a person on bail, if the court finds that the individual "[p]oses no significant risk of intimidating witnesses or otherwise obstructing the administration of justice." USCR 26.1(H) states the procedure for setting bond, if granted.[64]

The record shows that the Appellant filed her initial request for bond in this case on October 23, 2014. DFCS filed an opposition to the Appellant's motion for bond, arguing that any contact by the Appellant's children to their parents "would be detrimental," and disruptive "as the parents are opposed to the lifestyle the children presently enjoy[.]" The record shows that the Appellant did not file a rebuttal to the DFCS opposition. The trial court denied the Appellant's motion, ruling that "[the Appellant] had a bond hearing on August 5, 2014[,] wherein bond was denied in case 14-B-02691-5Q [ ]" and in her motion for bond dated October 23, 2014, she did not "state any additional facts that were not presented at the first hearing[.]"

---

[64] USCR 26.1 states in pertinent part,
Immediately following any arrest but not later than 48 hours if the arrest was without a warrant, or 72 hours following an arrest with a warrant, unless the accused has made bond in the meantime, the arresting officer or the law officer having custody of the accused shall present the accused in person before a magistrate or other judicial officer for first appearance. At the first appearance, the judicial officer shall . . . (H) Set the amount of bail if the offense is not one bailable only by a superior court judge, or so inform the accused if it is.

The Appellant filed two subsequent motions for bond, and the trial court held a bond hearing on December 23, 2015. At the hearing, the trial court denied the Appellant's motion, ruling,

> I deny bond. I cannot make the finding that you pose no significant risk of intimidating witnesses or otherwise obstructing the administration of justice. I cannot make the finding that you pose no significant risk of committing felonies pending trial with the exception of possibly influencing witnesses.

The Appellant filed additional motions for bond. The trial court, on December 29, 2016, denied the Appellant's motions for bond, finding that the Appellant "presented no new information[,] testimony[,] or evidence that indicate[d] a change in circumstances."

Based on our review of the record and the foregoing, we find that it was not error for the trial court to deny the Appellant's motions for bond.[65]

(b) She further argues that it was error for the trial court to deny her motion for bond pending appeal. The trial court denied her motion, which alleged her notice of appeal, filed February 3, 2017, removed jurisdiction from the trial court, and

---

[65] See OCGA § 17-6-1 (e) (4); see also *Rooney v. State*, 217 Ga. App. 850, (459 SE2d 601) (1995) (Proper for trial court to deny the defendant bond because he posed a substantial risk of intimidating witnesses pending trial.).

transferred it to the Georgia Court of Appeals. The record shows that the Appellant was sentenced on February 1, 2017. OCGA § 5-6-36 (a) states in relevant part, "[t]he entry of judgment on a verdict by the trial court constitutes an adjudication by the trial court as to the sufficiency of the evidence to sustain the verdict, affording a basis for review on appeal without further ruling by the trial court. Therefore, it was not error for the trial court to deny the Appellant's motion for bond pending appeal.

*Judgment affirmed. Miller, P. J., and Doyle, P. J., concur*.